UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------X
ACE UNIVERSE INC.,                      :

       Plaintiff,                      :  Docket No. 20-cv-2517

                                       :

       -against-                      :  **COMPLAINT**

GROWTIX LLC and PATRON                  :
TECHNOLOGIES LLC                           **JURY TRIAL DEMANDED**

       Defendants.                     :
---------------------------------X

Plaintiff ACE Universe Inc. ("ACE"), by its attorneys Spiro Harrison, brings this action against Defendants GrowTix LLC ("GrowTix") and Patron Technologies LLC ("Patron"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an action seeking to recover damages in connection with a scheme to harm and defraud ACE by stealing millions of dollars that ACE and Defendants agreed would be used to refund customers after the cancellation of an event in Boston by State Emergency declared in response to the spread of the coronavirus.

2. The fallout from the coronavirus and the cancellation of events around the world has left many companies like GrowTix and Patron in financial peril. In an apparent effort to mitigate the calamity from this fallout, Defendants induced ACE to provide $680,000 by falsely agreeing to use the money to refund ACE customers. In doing so, Defendants committed fraud, and breached an agreement to make ACE customers whole.

3. Founded in 2017, ACE has become a global leader in the multi-billion dollar comic con event planning industry. ACE's founders, brothers Gareb and Stephen Shamus,

formed ACE to develop a unique, immersive experience for superhero and comic book fans around the world, selling out massive, multi-layered events in arenas and convention centers across the United States.

4. ACE's success, which led Forbes Magazine to describe it as the "World's Premier Pop Culture Event," in November 2019, is driven by its reliability, meticulous planning, and its unyielding adherence to the fan experience.  To its founders, loyalty to its fellow comic book fans is paramount.

5. Between March 20, 2020 and March 22, 2020, ACE was scheduled to host and sponsor an ACE Comic Con Northeast event in Boston ("ACE Northeast"), with several notable celebrities expected to speak on panels, participate in photo opportunities ("Photo Ops") with ticketholders, and sign autographs for the show.

6. The near-sold out, three-day event would be an enormous success, with numerous celebrity, A-list guests appearances, among the many festivities planned.

7. To sell VIP, Photo Ops and autograph tickets for the event, ACE used Defendant GrowTix, a third-party software company that processed ticket sales through its mobile app and online portal.

8. The relationship between ACE and Defendants was governed by a Ticketing Software Services Agreement (the "Ticketing Agreement"), executed in May 2018, that covered all ACE events.

9. Under the Ticketing Agreement, GrowTix processed the ticket sales through its software and was paid a fee based on the percentage of sales.  GrowTix paid ACE weekly, as ticket sales were processed.

10. Notably, the Ticketing Agreement contained a force majeure provision, which excused either party's performance of its obligations in the event of an Act of God or governmental action.

11. On March 11, 2020, government action forced ACE to shut down ACE Northeast due to a State of Emergency declared by the Governor of Massachusetts on March 10, 2020 during the outbreak of the coronavirus.

12. Immediately after the State of Emergency was announced, ACE spoke with officials from GrowTix, insisting that all customers must be given full refunds within 30 days due to the force majeure. GrowTix agreed.

13. ACE knew that the refund policies of many other event promoters shut down from the coronavirus were not as ambitious, but ACE did not hesitate, believing strongly that the fans should be made whole immediately. GrowTix led ACE to believe that it did too.

14. In several discussions and emails over the next few days, starting on March 10, 2020, including with GrowTix President John Sloan, the Parties, including GrowTix's and ACE's respective employees, agreed to a very detailed refund plan and strategy ("Refund Agreement"). The Refund Agreement provided that ACE would fund the refunds to customers on a rolling basis. In exchange, GrowTix would process the refunds through its software and handle the logistics of rolling out the refund plan. The Parties agreed that the Refund Agreement would supersede any prior agreement regarding fee payments and refund processing.

15. In reliance upon GrowTix's promise to give full refunds to customers and to begin processing them immediately, ACE made a public announcement through its Facebook, Twitter and Instagram accounts on March 11, 2020 declaring that all customers would be given full refunds within 30 days.

16. Also, in reliance on GrowTix's promises, on or about March 10, 2020, ACE agreed that $680,000 transferred to GrowTix by ACE should be used to facilitate refunds, initially at a schedule of $25,000 per day. ACE would then source additional funds until all customers were repaid, accelerating the sourcing rate as needed to ensure refunds were completed within thirty days.

17. From Wednesday, March 11th through Friday, March 13th, GrowTix led ACE to believe that it fully intended to process the refunds, through several phone calls and emails regarding timing, logistics, communications, among other things. ACE's continued, singular focus was to ensure that all customers were made whole as quickly as possible.

18. On Monday, March 16, however, ACE received a letter from Marc Jenkins, CEO of GrowTix parent, Patron ("Jenkins Letter"), advising it that it was not only withholding the money transferred to it for refunds, but was also demanding more money from ACE in regards to its own fees, directly contradicting the Refund Agreement.

19. Stephen Shamus also received a text message from GrowTix President John Sloan, assuming a decidedly different posture than he had just days before, stating: "That [refund] plan no longer works for us."

20. The noticeable shift in tone from John Sloan asserting a complete about face by GrowTix on the Refund Agreement, and the desperate letter from Marc Jenkins, someone ACE had never dealt with in the many years it had worked with GrowTix, led ACE to conclude that GrowTix and its parent, Patron, were desperate, given the economic fallout from the coronavirus.

21. At the time, ACE was deeply concerned about Defendants motives and intentions regarding the refunds to ACE customers and the hundreds of thousands of dollars it was withholding.

22. On March 17, 2020, these concerns were realized when Defendants attempted to seize and withdraw $2.3 million from an ACE bank account, just a few days after the Parties had agreed to cooperate in getting all of the ACE customers their money back.

23. Since March 16, 2020, not a single refund has been issued, as far as ACE is aware. The continued failure to process the refunds expeditiously has and will result in substantial damage to ACE, amounting to hundreds of thousands of dollars in chargeback fees and other related transactional fees avoidable if the Refund Agreement had been followed.

24. Defendants' fraudulent conduct and breaches of the Refund Agreement have caused and will continue to cause ACE damages beyond just the $680,000 it was induced to pay Defendants, but reputational and financial harm caused by its failure to meet the Parties' refund obligations. ACE has always put its customers first and has a reputation for doings so. Defendants conduct has damaged and will continue to damage that reputation irreparably.

25. Based on the foregoing, ACE seeks damages for the reputation and financial harm caused by Defendants' improper conduct.

## **PARTIES**

26. Plaintiff ACE is a corporation organized under the laws of New York, and maintains its principal place of business in New York, New York. ACE does business as ACE Comic Con.

27. Defendant GrowTix is a Utah limited liability company and is a subsidiary of co-defendant Patron Technologies.

28. Defendant Patron Technologies LLC is a Delaware limited liability company and maintains is headquartered in Pittsburgh, Pennsylvania.

## **JURISDICTION AND VENUE**

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

30.     This Court has personal jurisdiction over GrowTix and Patron because, among other things, GrowTix and Patron transact business in, and have substantial contacts with, New York. GrowTix and Patron also purposefully availed themselves of doing business with ACE, which has its principal place of business in New York.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), or, in the alternative, pursuant to 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

### A. ACE is Formed to Give Comic Book and Superhero Fans the Ultimate Immersive Fan Experience

32.     The Shamus brothers have been involved in and consumed by comic books, and the business of comic books, from a very young age.

33.     In Nanuet, New York, near where the brothers grew up, their mother owned a comic book and sports card store, the Wizard of Cards and Comics, where they spent hours pouring though the comic books and learning about the business.

34.     In or around 1990, Gareb started a newsletter about comic books for his mother's store.  Over time, that newsletter grew steadily to become one of the leading comic book magazines in the world, Wizard Magazine, selling hundreds of thousands of magazines to people from over 75 different countries.

35.     Wizard Magazine was unique, in that it not only published articles about comic books, but about movies, toys, and games about comic books or the characters in the comic

books.  Based on Wizard's popularity and wide following, Gareb decided to convert the magazine into a series of live events for Wizard's followers and other comic book collectors and enthusiasts.  These smaller live events spawned the modern comic con.

36. Through the success of these live events, the Shamus brothers began developing the idea for comic book conventions, approaching the events with the same, all-inclusive approach, bringing in writers, movie stars, toy makers, video game developers, among others.

37. After years of shaping and perfecting this new comic con model, the Shamus brothers started ACE Comic Con in 2017.  Since then, ACE has hosted seven hugely successful comic con events around the United States.

### B. Agreement Between ACE and GrowTix/Patron

38. Planning for each event must begin 12-18 months in advance, as the ACE team must book the venue, hospitality vendors, ticketing, sounds, lighting, exhibitors, speakers, celebrity appearances, among many others.  The cost for each event is several million dollars.

39. ACE uses certain vendors for several of its events, including GrowTix, which it used for its VIP, Photo Ops and autographs ticketing platform and processing.

40. In 2018, ACE entered into the Ticketing Agreement, whereby ACE agreed to use GrowTix as a ticketing and event management provider for all of its events.

41. Under the terms of the GrowTix Agreement, GrowTix agreed to provide ACE with the following services: (i) create and provide ACE access to a landing page for ACE venues and events; (ii) establish and support hypertext links from external websites to the GrowTix software for ACE venues or events; (iii) provide access to the GrowTix purchase and sale mobile application so registration and ticket purchases could be processed; (iv) accept and process registrations and ticket orders for ACE's venues and events; (v) collect credit card payments on

ACE's behalf; (vi) set up and provide ACE with a username and password to GroxTix's back office tools, which included customization tools and reports; and (vii) provide ACE with technical support for the GrowTix software, as needed (collectively, "the Services").

42. In exchange for GrowTix's performance of the Services, GrowTix was to be compensated pursuant to a payment structure based on a percentage of ACE's sales through GrowTix's platform.

43. The Ticketing Agreement contained a Refunds and Cancelled Events Provision (the "Cancellation Provision") which provided that, in the event of cancellation, ACE would return all funds disbursed to it by GrowTix under the Ticketing Agreement within 72 hours, and GrowTix would handle the processing of the refunds.

44. The Ticketing Agreement also contained a force majeure provision, which states that if either ACE's or GrowTix's performance was prevented, hindered, delayed or otherwise made impracticable by reason of "governmental action" or an "act of god," beyond the control of either party, the party unable to perform would be excused from its performance under the Ticketing Agreement.

**C. ACE Comic Con Northeast**

45. After the completion of seven hugely successful events in just over two years, ACE planned another comic con event in Boston, Massachusetts for March 20 through March 22, 2020.

46. ACE booked over ten A-list celebrities to appear at ACE Northeast, along with several other notable industry players.

47. With the collection of talent assembled by ACE, and the numerous, popular exhibition and panel sessions scheduled, ACE Northeast was shaping up to be one of the biggest comic cons ever.

48. ACE sold thousands of premium tickets to the event, with over 125 exhibitions, 100 illustrators and speaking engagements by notable industry leaders and celebrity guests.

49. All of the VIP, Photo Ops and autograph tickets were sold and processed through GrowTix ticketing and software platform.

50. Pursuant to the Ticketing Agreement, ACE was disbursed funds on a weekly basis, which were used to fund the event.

**D. Outbreak of Coronavirus Causes the Cancellation of ACE Northeast and the Parties Form the Refund Agreement in Response**

51. On January 21, 2020, the United States Center for Disease Control and Prevention ("CDC") confirmed the first case of the Coronavirus in the United States in Washington State. On the same day, the WHO determined that the Coronavirus outbreak constituted a Public Health Emergency of International Concern (PHEIC).

52. On January 30, 2020, the CDC confirmed the first person-to-person spread of the Coronavirus in the United States. Previously, all confirmed U.S. cases had been associated with travel to Wuhan, China.

53. On January 31, 2020 the Boston Public Health Commission and the Massachusetts Department of Public Health were notified by the CDC of a confirmed case of Coronavirus in Boston, Massachusetts.

54. By March 10, 2020, ninety-two Coronavirus cases had been confirmed in Massachusetts.

55. Accordingly, that same day, to combat the continued spread of the virus, Massachusetts Governor Charlie Baker declared a State of Emergency, which resulted in, among other things, the prohibition of all gatherings of 250 or more people, preventing the continuation of ACE Northeast and triggering the Ticketing Agreement's force majeure provision.

56. ACE Northeast was not the only event prevented as a result of Governor Baker's declaration of a State of Emergency. The St. Patrick's Day Parade and Boston Marathon were shut down, and all professional sports leagues and associations across the country were postponed or cancelled.

57. In response to the government shutdown of ACE Northeast, Stephen Shamus immediately reached out to John Sloan, and several others at GrowTix, to discuss a plan to refund ACE Northeast ticketholders due to the government shutdown and the triggering of the force majeure.

58. The Parties understood that due to the force majeure under the Ticketing Agreement, the obligations of the Parties therein no longer applied.

59. After several conversations between ACE and GrowTix personnel, a swift and manageable Refund Agreement was set in place. Generally, the Refund Agreement provided that ACE would fund the refunds over the course of thirty days and GrowTix would facilitate and process the refunds.

60. Specifically, the Refund Agreement provided that refunds would begin on March 16, 2020 using the $680,000 disbursed to GrowTix, initially at a schedule of $25,000 per day. GrowTix would then continue to pay refunds, funded by ACE, on accelerated basis as needed, to ensure refunds were completed within thirty days.

61. The Parties agreed that all customers would receive a full refund within 30 days of ACE's notice to fans that ACE Northeast had been shut down.

62. In reliance upon the Refund Agreement, 1) ACE funded the $680,000 for GrowTix to use for refunding customers and, 2) ACE made an announcement, on March 11, 2020, on Facebook, Twitter, and Instagram that all customers would receive full refunds after the government shut down of the event in response to the coronavirus.

63. Over the course of the next three days, leading up to the agreed upon refund date of March 16th, ACE and GrowTix exchanged several telephone calls and emails concerning the implementation of the Refund Agreement.

64. In a series of emails between ACE and GrowTix Customer Service Manager Rob Simmons on March 12, 2020, Simmons repeatedly confirmed the refund plan with ACE.

65. These exchanges led ACE to believe that GrowTix had fully intended to comply with the Refund Agreement.

**E. ACE Learns that GrowTix Did Not Intend to Honor the Refund Agreement**

66. Instead of beginning the refunds as promised on March 16, 2020, however, GrowTix parent company, Patron, through its CEO Marc Jenkins, sent the Jenkins Letter demanding payment of all amounts disbursed to ACE and its fees owed in connection with the Ticketing Agreement.

67. Stephen Shamus also received a text message from John Sloan that starkly contradicted the Refund Agreement. Sloan wrote, "That [refund] plan no longer works for us."

68. Still withholding the wrongfully obtained $680,000 without any meaningful refund activity to date, on the very next day, March 17, 2020, Patron sought to attach and withdraw $2.3 million from ACE bank accounts in the middle of the night. Fortunately, this

unauthorized attack on ACE's bank accounts, which would have jeopardized the company and all but destroyed any chance at refunds, was prevented. Defendants actions starkly contrasted the apparent cooperation the week before and the terms of the Refund Agreement.

69. Not only did the tone and tenor of these actions suggest that Defendants were not going to comply with the Refund Agreement, as confirmed by Sloan, but they also suggested that Defendants were no longer acting in the interest of the ACE customers, but their own self-interest and preservation.

70. Namely, GrowTix and Patron provided event management services to other event hosts across the country.

71. Like Massachusetts, many states have declared a state of emergency to limit the transmission of the coronavirus and have limited or restricted public gatherings.

72. Unlike ACE, many event hosts using the GrowTix and Patron platforms are not issuing refunds to ticketholders, resulting in a flood of chargebacks and credit card charge disputes.

73. Upon information and belief, neither GrowTix nor Patron have sufficient funds to process these chargebacks and refund requests.

74. Upon information and belief, GrowTix and Patron ignored the terms of the Refund Agreement, and improperly recovered and have attempted to improperly recover funds to which they are not entitled in order to fund chargebacks and refunds for other events.

**F. Defendants Have Improperly Withheld the Funds Intended for Refunds**

75. As it announced to its fans on March 11, 2020, after being induced by Defendants' false promise to begin processing refunds, ACE committed to returning all of the money to customers and making them whole.

76. ACE's commitment to the fans is a hallmark of its business, and it insisted that Defendants must begin processing all refunds by Monday, March 16.

77. On information and belief, despite having the software and the credit card information for all of the ACE customers, Defendants have not processed a single refund since March 16th. Defendants have also not provided this information to ACE so that ACE could process the refunds to its customers.

78. The failure to process the refunds, after agreeing to do so, reflects an intent by Defendants to not only violate the Refund Agreement, but to keep the money ACE paid to them for their own business interests.

79. In the meantime, banks and credit card companies have begun submitting chargebacks and will continue to do so en masse (thousands) over the next several days, each of which carries a $25 transaction fee.

80. The losses to ACE, due to Defendants' improper conduct, will amount to hundreds of thousands of dollars in improper transactional fees, and even more, much greater harm to its reputation with the inevitable failure to meet its refund obligations.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Against GrowTix)**

81. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

82. ACE and GrowTix entered into an agreement on or about March 13, 2020 to refund all money back to ACE Northeast customers.

83. Under the terms of the Refund Agreement, GrowTix would refund ACE Northeast ticketholders by issuing refunds using the $680,000.00 disbursed by ACE, initially at a schedule of $25,000 per day. ACE would then source additional funds until all customers were repaid, accelerating payments as needed to ensure refunds were completed within thirty days. ACE and GrowTix also agreed that refunds would begin on March 16, 2020.

84. GrowTix breached the Refund Agreement by failing to refund customers by March 16, 2020, and by withholding the $680,000.00 disbursed to it by ACE for those refunds.

85. At all times, ACE performed or was willing to perform its obligations under the Refund Agreement.

86. GrowTix's breach as described herein have caused damages to ACE.

87. Based on the foregoing, ACE has suffered damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against GrowTix)**

88. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

89. ACE and GrowTix are parties to the Refund Agreement.

90. Implied in the Refund Agreement is a covenant that the Parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the Refund Agreement.

91. GrowTix failed to perform its obligations in good faith under the Refund Agreement by failing to begin refunding ACE customers on March 16, 2020 and by

subsequently initiating an unauthorized withdrawal $2,300,000.00 from ACE's bank account on or about March 17, 2020.

92. In entering into the Refund Agreement, GrowTix knew that an important objective for ACE was to refund ACE Northeast ticketholders in accordance with the agreed upon schedule. Defendants also knew that ACE had made representations to its customers in reliance upon the Refund Agreement.

93. As a direct and proximate result of GrowTix's violation of the implied covenant of good faith and fair dealing, ACE has suffered damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### Fraud
### (Against GrowTix and Patron)

94. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

95. On or about March 13, 2020, GrowTix and ACE entered into the Refund Agreement, with the intention of causing ACE to disburse funds to GrowTix so that they could improperly retain and withhold the funds for its own self-interest.

96. In reliance upon several representations by GrowTix, including through GrowTix President John Sloan, Customer Service Manager Rob Simmons, Director of Client Success Nick Dianatkah, and Operations Manager Derek Diccter, ACE disbursed $680,000 to GrowTix to begin refunding ACE Northeast customers.

97. To date, Defendants have withheld the $680,000 and have not made a single refund to ACE Northeast customers.

98. On March 16, 2020, Patron, through its CEO Marc Jenkins, demanded fees in connection with the Ticketing Agreement, despite the force majeure, and demanded the full,

immediate payment of all fees disbursed to ACE, despite knowing that ACE could not meet these demands.

99. On March 17, 2020, Defendants attempted to make an unauthorized withdrawal from ACE's bank accounts in order to improperly obtain even more money from ACE.

100. As a direct and proximate result of GrowTix's and Patron's actions, ACE has suffered damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### Promissory Estoppel
### (Against GrowTix)

101. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

102. As set forth above, GrowTix made a series of clear and unambiguous promises to ACE in the Refund Agreement.

103. GrowTix intended, or reasonably should have expected, that ACE would rely on GrowTix's promises to issue refunds to ACE Northeast ticketholders in accordance with the schedule ACE and GrowTix agreed on in the Refund Agreement.

104. To its detriment, ACE reasonably relied on GrowTix's promises when it entered into the Refund Agreement, transferred $680,000.00 to GrowTix so it could begin issuing refunds to ACE Northeast ticketholders, and issued statements on its social media accounts that ACE Northeast was cancelled and all ticketholders would receive a refund within 30 days.

105. As a direct and proximate result of GrowTix failure to honor its promises, ACE has suffered damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### Conversion
### (Against GrowTix and Patron)

106. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

107. Defendants have unlawfully and intentionally withheld identifiable sums of money owed to ACE.

108. Defendants have acted willfully and maliciously with the intent to economically harm ACE, ACE's business, and ACE's relationship with its fanbase, followers, and customers, and is thus subject to punitive damages.

109. As a direct and proximate result of Defendants' conduct, ACE has suffered damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### Accounting
### (Against GrowTix and Patron)

110. ACE incorporates by reference the allegations in the preceding paragraphs as if set forth at length herein.

111. As set forth above, GrowTix has breach its duty to act in accordance with its limited authority to hold ACE's funds to issue refunds and to accept further deposits from ACE.

112. As a direct and proximate result of GrowTix's acts, ACE has suffered damages in an amount to be proven at trial.

113. As a result of the foregoing, ACE demands an accounting of all the refunds issued to ACE Northeast ticketholders and all other refunds or chargebacks GrowTix processed to ensure it properly and lawfully used ACE's funds.

**WHEREFORE**, ACE demands judgment as follows:

    a. Specific performance;

b. An award of damages against GrowTix and Patron, in an amount to be proven at trial;

c. punitive damages;

d. injunctive relief;

e. an audit and accounting of GrowTix's books and records;

f. prejudgment and post-judgment interest;

g. attorneys' fees and court costs;

h. such other and further relief as may be just and proper.

Dated: March 23, 2020
      New York, New York

**SPIRO HARRISON**

*/s/ David B. Harrison*
David B. Harrison
119 West 24th Street, 4th Floor
New York, NY 10011
dharrison@spiroharrison.com

*Attorneys for Plaintiff*
*ACE Universe Inc.*